The first case for argument this morning is 17-1161, Ultratec v. Sorenson Communications. Ms. Noel? Thank you, Your Honor. May it please the Court, Christian Noel, appearing on behalf of Appellants Ultratec and CapTel. In overturning the jury's verdict of non-obviousness, the District Court made several errors, material errors, including taking improper inferences in favor of Sorenson, making findings that were not supported or contradicted in the record, and disregarding substantial evidence of lack of motivation to combine. Can I ask you just a tangential question, which is you spend a great deal of time, or some time in both briefs, blue and yellow, pushing back on whether or not CapTec, whatever, I don't know what the name is, is prior art. Now the judge, the jury, considered it to be prior art, right? So I guess I was wondering why you spend, I mean, is it an alternative argument? I mean, why are you spending so much time? Because you're asking us to find substantial evidence with the jury's verdict. The jury already considered that as prior art. So you don't want us to overturn, you know, I don't understand why you're spending so much time on that issue. That's correct, Your Honor. The jury assumed and was instructed that the CapTel trials were, in fact, prior art. Notwithstanding the fact that that ruling, the jury considered the CapTel trials and the 685 publication, and in light of the evidence, the substantial evidence. No, I know, but when you're arguing that they shouldn't have considered it, is that just an alternative argument? Yes, Your Honor. Oh, okay, so that's an alternative. So if we were to find that we would affirm the district court on the J-law, you would say that we shouldn't do that for the additional alternative reason that they shouldn't consider this. That's exactly right. So that would be a request for a new trial as opposed to being a reversal of the district court. That's correct, Your Honor, and that's why our primary appeal is on the substantial evidence argument because that would obviate the need for a new trial. The substantial evidence argument is based on improper finding of motivation to combine? That's correct, Your Honor, and I can give a couple of examples. There's no question but that the features here that are in the patent were in the prior art, the two-line system and the echo cancellation, right? Subject to the fact that there is no prior art of an echo canceller in a captioned telephone to cancel the voice of the assisted user, so there would have to be a modification of the combination to come up with the full invention. And that's basically your argument about motivation to combine, right? Right. There's no question that there was plenty of evidence showing the advantages of a two-line system and plenty of evidence showing the advantages of echo cancellation, right? There was indeed, but even with those two advantages and the prior art, there was never prior to the invention one telephone that a deaf or hard of hearing person could use that would have all the benefits which fall under the umbrella of functional equivalence. But both your witness and the other side's witness said that it would be logical in making the combination to move from the relay to the captioned telephone for the echo canceller. Not so, Your Honor. The District Court and Sorensen repeatedly make this statement, and it was referenced to Mr. Ludwig, Ultratext expert. They cite to the testimony which is found in the appendix at 15,009. And if the court looks to that testimony, you will find that there's a rather garbled question followed by a really unremarkable circular answer. Question. What is that, 15,009? And nine, Your Honor. Okay. If I may, Your Honor. Question. You would agree with me that the logical place to put the echo cancellation in a two-line for two-line captioned telephones is within the telephone, correct? Answer. If one has already made the decision to place an echo canceller in a phone, then the logical place would be in the phone. Question. In the phone? Answer. If one has made the decision that an echo canceller is needed in the phone, yes, then it has to go there. That is hardly an admission that that was the logical place or obvious place. It's simply a circular statement that if you decide to put it in the phone, it goes in the phone. Let me ask you about, I'm looking now, for instance, on page 8 of your yellow brief, because you talk about the evidence you rely on for this inoperability or this. And the two highlights of this, and you have a few other things, but I think the two main points is you've got Mr. Ludwick, as you admit, summarized the incompatible architecture. And if you look at the site you have for that, it's a conclusory summary statement. Would you agree with that? I agree that that cited statement is a conclusory statement. However, in the record, Mr. Ludwick was asked extensively about the prior testimony of Mr. Colwell. And Mr. Colwell gave extensive testimony on a couple of things that are very notable. Well, but firstly, the site in your brief is only to that one site. But on Mr. Colwell, let me ask you, because you talked about him before that, and you said he explained the different configuration and why technology used in one would not be expected to work in the other. I mean, those are key kind of trigger words. And frankly, maybe you can show me, because I couldn't find where he said that in the site. Absolutely. I believe the most probative site would be to Appendix 22,000. Why don't you look at what you cited to us, which was 15778 to 15780, because that's what I looked at, because that's what you cited us to. I will pull that. But I will say, Your Honor, I believe elsewhere in the brief we cited to 22,667 through 70. Yeah, that was a C also. Okay. And that, I think, is the most probative evidence. And in there, Mr. Colwell describes – What page? What's the other page? 22,667 through 70. Okay. And Mr. Colwell walks through the differences between when you would have echocancellation at the relay. It's literally in a very well-contained environment, where, for example, if they have problems with the echocanceller, they can make the telephone signal stronger or weaker. In sharp contrast, if you have to put an echocanceller – No, but I'm looking. Why don't you show me then, because what you characterize it is, is he explained the different signal paths and why the technology used in one would not be expected to work with the other. So a lot of this is very technical, but can you sort of point to me, did he conclude or did he talk about this wouldn't be expected to work with the other? Can you just point to me to where that is? Well, I'm looking, Your Honor, at 22,667. When you were developing a two-line phone, did you have any concerns about the environment you were going to put that into in the real world? Yes, we did. Explain that, please. Well, in one-line CapTel, we used this box that was referred to as a DSPCOM, and it sits by a CA – that's call assistant – agent station, and the telephone line signals come through a special PBX. I don't know if you're familiar with the term PBX. Okay, well, wait. I don't want to take all your time because this goes on for several paragraphs. I'm just looking for – If I could also note, Your Honor, Mr. Colwell also testified that, in fact, when they went to the two-line system, they didn't even originally think to use the echo cancellation for two reasons. The first reason is they were having such problems getting the echo canceller to work in the one-line system that they didn't want to use that. Is that analysis included in what you just cited us? Do you know where that is in the record? It is in the record, and, Your Honor, I believe that would be Appendix 22,670. So the first reason he gives is because of the troubles that echo cancellation was giving them at the critical date in the one-line system, and the second reason was this difference in architecture, that even if you could get it to work in one line, you would have such greater variability and lack of control was their working theory. What is the conclusion that's reached about that? Because any time you're going to combine pieces of prior art under an obviousness, they're going to be changes that have to be made to the prior art. What is the suggestion here that it appeared to be so difficult to do that, that it would have deterred someone from doing it? Where does he say that? That is precisely our argument. What's your argument, but where's the testimony that supports it? The testimony that supports it is that the inventors themselves were having such problems with the one-line system that they didn't even think to use it themselves. It was a year later. They launched the two-line system in earnest on research and development in 2001. I'm sorry, what do you mean the inventors found it so difficult, one-line system? They didn't even think of using it for what? Using it with a two-line system? To block the voice. To block the voice in the two-line system, that's correct. They originally thought of a different method to split the voices, tapping at the earpiece of the CA, and it was for two reasons. All of the difficulties. Where's the testimony that someone skilled in the art would have been deterred from approaching it this way because of these likely difficulties? Well, Mr. Caldwell's testimony at 22,670 establishes the fact that the jury was allowed to consider. Mr. Caldwell relied upon those facts and summarized it. But he doesn't actually say that someone would have been deterred, right? Well, he said they were deterred. When does he say that? When he, at 22,670. Where? I don't see where he says they were deterred. Well, he says, well, if we're having some problem with the echo canceler in the one-line, are there other ways we could do it in a two-line? And we talked about actually taking the audio off the earpiece and sending it to the CA, but we didn't, in fact, find that acceptable or do that. But I don't know why. Does he explain why they didn't do it anymore, that we didn't find that acceptable? Only the citations that I've given you that he compared the two systems. But your response to the Chief's first question, which is where did he say that the two are different, that actually starts a little earlier than you first cited us. Doesn't that start at 2266 and go over into the ‑‑ I mean, he actually does begin the discussion of how there are differences between the two. Yes, Your Honor. And this is all evidence from which the jury had the right to take a reasonable inference that a person of ordinary skill in the art looking at all the problems they were having with the CapTel trials wouldn't think to go to this prior art and wouldn't think to combine it. The question before this court, for the district court, and now DeNova before this court, isn't to look for substantial evidence in support of Sorenson. The jury could have ruled that way. They didn't, and they made several important factual findings. We have to respect those implied factual findings because they are supported by substantial evidence. But this isn't substantial evidence of teaching away, right? I think, Your Honor, under the recently ‑‑ Thank you. I'm in my rebuttal time. Under the standard recently set forth in Arctic Cat versus Bombardier, which is a case decided after the briefing, you don't need a full teaching away. But if you look at the prior art reference, and here we have this living, breathing prior art reference of the full CapTel trials and all the problems they were having, including past the critical date, the documents, you don't even have to believe the witnesses, the documents we cited say echo cancellation is in development, does not work, continue to have problems. It was the number one complaint through the critical date. The POSA would be charged with all of that knowledge, and you can't simply look to one teaching of the prior art reference. As we learned in Arctic Cat, you have to look at all. They said does not work, whatever. Is that the citation you're already talking about, or is that somewhere else? Some of the documents that would support that would be found at appendix 23,616 and 23,615. And those documents say it doesn't work? Line echo, client hears its own voice. Echo canceller is currently under development. Testers report client still hears echo. Echo problem is still quite prevalent, exclamation point. I'm sorry, can you give me the site again? Sure, 23,615 and 23,616. What stage in the development of the single line echo canceller are those documents relating to? They relate to August and September of 2003 and the critical date, I believe, in February 2003. So all these problems of POSA would be charged with knowing when deciding how to develop this system. Before the critical date, the one line echo canceller was being used, and used extensively, right? It was being tested extensively, and it was failing. And Ms. Frazier testified. I thought there was representation to the FCC that it worked. Oh, no, Your Honor. And that is a fundamental, I think, misstatement of the evidence. The FCC was told that the CAPTEL trials as a whole were succeeding, but there is no mention of echo cancellation. And the data in that FCC document, it is undisputed that the data in that document was based on testing done, not in the trials themselves, but in the lab. They were using plain one-sided tapes, just the hearing user's voice, and having a call assistant test the other technology. Because this was part of a much larger project where they were testing a brand new revoicing system. And so the fact, the representations that it worked, or the accuracy and speed they were achieving, that was test done without echo cancellation. And the reason why that they had to do it that way is it was, it would violate the FCC rules. Ultratech was not allowed to tape these live calls. So there's no way to test speed and accuracy unless you're retaining what the other user is saying. So that is absolutely evidence of nothing as to how well the echo cancellation works. Your position is that because there were problems with the one-line system, someone would not have thought to use echo cancellation in the two-line system. That's precisely right, and that's at least, Your Honor, a reasonable inference. And it is an implicit finding by the fact finder that this court has to respect. I know you passed your time, but we control that. Thank you, Your Honor. Let me ask you to comment briefly about the secondary considerations. Yes, Your Honor. I was a little unclear on what the district court actually was doing. He says that he considers them supported by substantial evidence, so you don't have any problem with that. Correct. So what's the problem? I mean, he's giving them credit, and then he's doing a weighing thing, which is arguably a legal thing to do at the end of the day. So what's the problem with what he did? So under this court's authority, including WBIB versus Kohler, there's not just one factual finding that the district court has to respect. There are three. The first one is the existence of the secondary considerations. The district court at least gave lip service to that. But what he didn't respect was the implicit finding by the fact finder that there was a nexus between those secondary considerations and the claimed invention. Well, he wouldn't have said that there is evidence. I mean, that's what I'm confused about, frankly, because he wouldn't have said, if he didn't think there was nexus, then he would have said they shouldn't have considered those as indicia of non-obviousness. And he said the opposite. And then I understand. I mean, he says, then he goes on to say, was very weakly tied. Is that what you think he was talking about, the nexus there? Yes, he's criticizing nexus, even though there is a presumption of nexus because the unrebutted testimony was. But even though he had said previously that he was kind of crediting. So I'm really just asking you for how you're reading it. We are reading this at the district court heard Brenda Patat's testimony on secondary considerations. And immediately after, he ruled on the record that Ms. Patat's testimony alone is substantial evidence to find non-obviousness. And he said that a couple of times. It was only a year later when he's reweighing the evidence and looking to how perhaps the district court thought this case should have been tried. And he looked to functional equivalence, that's Ms. Patat's same testimony, and said that supports a motivation to combine. So you can't do that as a district court on a judgment as a matter of law. You must give a reasonable inference. But I'm asking about the secondary considerations. Yes, and that was Ms. Patat's testimony. The judge actually looked at secondary considerations and said that was evidence of a motivation to combine, which is an impermissible inference for him to take. Perhaps Sorenson could have, should have argued that to the jury. For the record, they never argued the district court's stated motivation to combine to the jury. They never offered functional equivalence as a reason why. So the judge looked at the evidence, agreed with us on the substantial evidence, a year later changed his mind. But with respect to the question that the chief was asking, initially what he said was, okay, there's a nexus, but I just don't think it's a good nexus. Is that what he was saying? He was criticizing. A strong nexus? A strong nexus. But he had to concede there was a nexus. He did concede it, but then, Your Honor, he clearly didn't apply it, because there was not just a presumption, but there was also direct evidence supporting nexus. The third factual determination, implicit determination under WBIP, which the judge disregarded, is that the jury had to make the factual determination of the probative value of the secondary considerations. And the judge doesn't address that at all. In fact, he gives his own view of the probative value, which is improper on a judgment as a matter of law. Okay. I'll always start something about it. Let's hear from the other side. Thank you. Good morning. May it please the Court. Prateek Shah for Sorensen Communications and Caption Call. The trial record reveals agreement between both sides' witnesses on three material points underlying the obviousness determination. First, the prior art, namely the 685 publication and the CapTel trials, disclose all the same features of the patents at issue. Second, there were undisputed benefits of combining the two-line caption telephone system from the 685 with the echo cancellation feature from the CapTel trials. And third, a person of ordinary skill in the art would find only one logical configuration to make that combination work, that is moving the echo canceller from the relay to the caption telephone system. None of that, that's fine. But can you turn now to the two issues we were discussing, starting with motivation? Sure. Because none of those, what you say, were undisputed facts. Sure. Half the question of whether or not there was sufficient motivation. And in doing so, just as a background, I'm sure you know, whether you have a lot of evidence of that doesn't matter so much at this juncture. Right. It's really with respect to their evidence. No, absolutely understood, Your Honor. I mean, this is the rare case, and this is why we rely primarily on their experts' testimony to make the case to do it. Well, you just heard the dispute, especially as to that last point, as to whether that was a fair statement for you to make from the record. And frankly, when I went back and looked at what you cited, I didn't think there was strong evidence for that proposition. Okay. Well, let me take on the, just head on the two pieces of evidence that they cite that say, cut the other way. Despite, and I think this is undisputed, that five of the, all five experts, and we have all that. But so you're just ignoring the fact that your third point that you say cuts really in your favor really isn't in the record. Well, no, Your Honor. It is in the record. And let me explain that. Let me take that head on. First of all, all five experts did say if you were going to use echo cancellation in this device at all, there's only one place any person of ordinary skill in the art would put it. Those sites are on page 46, 45, 46, 47 of our brief. All five experts, four on their side and our side agree with that. And you should just, you can read them for yourselves and see that, but there shouldn't be any dispute about that. The two pieces of evidence that they cite that they say creates a substantial, that say supports substantial evidence against a motivation decline. Let me take those head on now. The first one is the stuff about incompatible architecture. We have no disagreement that their expert says that. And our expert agreed that if you just take these two pieces of art, as you find them, the two line system and the echo cancellation from the CapTel trials, they would be incompatible, but that's legally irrelevant. As this Supreme Court said in KSR and as this court has said numerous times, including the icon health case cited in our brief, it will often be the case that if you just take two pieces of prior and put them together, they'll be incompatible. They will not work. There has to be a modification here, but the key point here and the reason our expert agreed it was incompatible architecture, but our expert also said, and their four experts agreed that in order to put echo cancellation into the two line system, there's only one possible way you could do it. You put it in the caption telephone. So the incompatible architecture is legally irrelevant. It's not really irrelevant. When you think about the question that we have to be asking and you keep asking the wrong question, the question is whether or not there was substantial evidence from which a jury could conclude that you didn't prove by proof beyond, by clear and convincing evidence that, that there was a motivation to combine. That's a very different question than the one you want us to answer. You want us to look at the record as if we are the trier effect and decide which side we think has the better call on this, but that's not what our job is. Yeah, no, your honor. I don't want you to do that. I completely agree with the test. I completely agree with everything and that is why I want to rely on their experts. Look, there was a clear motivation to combine these two things. Everyone agreed. It's great to have a two line system. It allows greater convenience to those with hard of hearing. They can call people directly. They can call 9-1-1. Everyone agreed. There's no dispute about this in record. That echo cancellation of the assisted user's voice is a good thing. You would want that every time because it makes the call assistance job easier. But the fact that you would want an end result doesn't give you a motivation to combine two pieces of prior art. When you say clear motivation to combine, you're talking about a clear desire to get an end result. That actually in some ways would be a secondary consideration that would cut against. Sure, your honor, but if I can connect that, look, everyone agrees that you would want these two things together. You would want the benefits of it. So then the question is would a person of ordinary skill in the art have a reasonable expectation of success? Would they have a reason to combine these two things? They want all of the benefits. Do they have a technical way to get there? And they had a witness and your friend pointed it out to some of the testimony. And that witness went on and on and on talking about the complexities and the difficulties in doing that. And also on 22-670, she pointed us to his statement, which talked about how hard it had been, all the problems they had engaged in one line. And, you know, so that's, you're right. I mean, as a juror, I might not find that compelling. But why isn't that enough to dispel the clear and convincing evidence? Sure. So the reason why, a couple of reasons. One is you have to look at the timing. The question for obviousness is not as of the time of the CapTel trial in December. And if you look at that testimony, it says the time period, which Mr. Colwell is testifying, and this is on 22-669, the page before they cite, December 2001 to December 2002. That is not the relevant period for a person of ordinary skill in the art and the obviousness inquiry. It's at the time of invention, February 2004. By February 2004, everyone agrees that the echo canceler in the one-line system had been reduced to practice and was working fine. So let me just ask you about that point. In 22-670, the operative paragraph, he said, when we were deciding, are you, is it absolutely indisputed that when we were deciding, the timeframe there is the 2001-2002 timeframe? I mean, here's the question. It says, during that time period, did you have any meetings and discussions with your senior engineers about development? Yes. And did that occur over that entire year-long period? That's December 2001 to December 2002. And so that is the time period in which he's talking about it. And that makes sense. Look, when they were first thinking about it at that time, there was some uncertainty because they were still developing the CapTel one trials. But the question is, at the time of invention, at February 2004, CapTel trials- So where do you have evidence, where do you have evidence that at 2004, at the time of invention, there is no dispute that there would have been a motivation to combine these two things? Yes. So let's look at your evidence. Sure. So let me walk through it. So first is our expert, which I'll start with our expert. I think the best pages are 15.574 to 15.577 of the record. And there's our expert talking about why it would make sense to take this echo canceler and move it from the relay into the CapTel phone. The reason why, Your Honor, is- and this, again, this testimony, all five experts agreed on this. I think we're getting a little confused here. Okay. Because I think there are two separate issues. One issue is whether echo cancellation in the one line system was so problematic that one wouldn't have been motivated to pursue that. Right. And that's one of the arguments that they're making. The other argument has to do with moving the echo canceler from the relay to the CapTel phone. Right. Could you address those separately so that we don't get confused? Address first, perhaps, the suggestion that because of problems with the one line phone echo cancellation that someone would not have seen that advantage as a motivation to use it. Well, sure, Your Honor. Look, their one line CapTel, everyone agrees, was functioning perfectly well by February 2004. See, the date is- the critical date for obviousness is what would a person of ordinary skill in the art known at the time of invention? That is February 2004. It's not February 2003, the cutoff for the on-sale bar. It's not December 2001 to 2002 when Colwell was first developing, when they were first thinking about it. Sure, when they were first thinking about it, they said, look, we're having some problems in the CapTel One trial. Are there other ways to do it? And then, of course, he says, look, we thought about the other ways, but we didn't do those. They ended up doing the echo cancellation. But the question is, at the time of the invention, at the time, CapTel One was working, and they were getting FCC reimbursements for actually using it, and it was up and running, would a person of ordinary skill in the art thought, okay, here's an echo canceler of the assisted user's voice in CapTel One. Would I combine it with a two-line system in the 685 publication so that I can get echo cancellation and get both benefits? There's undisputed benefits of combining it. An expert, any person of ordinary skill in the art would want to do it, and here's the kicker on this. You haven't pointed me to anything in your evidence that clearly says what you're saying, that anyone would have wanted to do this. Again, the question is not whether anyone might have wanted to do it, but whether there was sufficient evidence from which the jury could conclude that you didn't prove that. Since you're not proving it to me, I'm beginning to wonder why, I'm beginning to understand why the jury didn't think you proved it to them. Okay, well, let me, and maybe I'm sorry if I'm doing a poor job, but Shannoy at 15591, he says, look, it is a natural progression when you move from a one-line system to a two-line system that you would want to have the echo cancellation of the assisted user's voice. At 1557, so that's the first part, I guess, to Judge Dyke's question, if I take them separately. The second part is, okay, if you want the- Slow down, slow down. Okay, sorry. All right. We're still talking about the relay. Right? So here, I guess, if you start on 15590, it says I'd like to walk you through the opinions on why a person of ordinary skill in the art would have combined the teachings as you've testified. Will you please explain this slide to the jury? So this slide refers to motivation to combine, is that why a person of ordinary skill in the art looks at what's around in the pieces and puts it together. The prior art included teachings and motivations to combine a two-line captioned telephone with the use of echo cancellation. It would arise naturally from the transition from a one-line captioned telephone to a two-line captioned system. Also, echo cancellation was already used in one-line system for canceling echoes of the voice-assisted user. So that is saying it'll just naturally occur? That's supposed to be sufficient evidence? No, what he's saying is that a person of ordinary skill in the art would want to take- Would want to? Yes. And then the second piece of it is would know how to do that. So the first piece, just to answer Judge Dyke's question, would they have been motivated, would they have thought to do it based on CapTel? On CapTel, yes. The answer is as of February 2004, CapTel is successfully blocking- What's your response to your friend's argument on the other side, that what you pointed to with respect to the FCC and the statements to the FCC was not actually what's at issue here? Okay, so it's conflating two different things, Your Honor, if I can clarify. That is with respect to whether it is prior art, the priority date, the priority cutoff date for the public use bar is February 2003. It doesn't matter what was happening in February 2003. Their argument there is it wasn't working perfectly as of February 2003. They have never argued, nor would they argue, in February 2004, when this service is up and running, CapTel trials are over, they've conclusively determined it works, that would do it. The date for obviousness is, of course, the date of the invention. That's February 2004. It's not the priority cutoff date for on-sale bars. That's the legal response. As a factual matter on the FCC petition, that was filed in April 2002, so that's the time frame we're talking about, not the relevant time frame. But if we want to even talk about that time frame, in that petition, this is what they said. This is at appendix page 25, 327. And this is a quote. The CapTel trial already has proven that there is now viable technology. Now, what they now say is, oh, well, we meant the CapTel trial without the echo canceler. They never said that to the FCC. This petition to the FCC is to get reimbursement for a working service. It's not to get—there's a fund that the FCC has set up for when you provide telecommunication services to the deaf and hard of hearing. This is a petition that says, pay us because we are providing working service to the deaf and hard of hearing. They never mentioned to the FCC, oh, that this excludes the echo canceler, nor could they have done that, because then it wouldn't be a working service. A critical part of this working service is the echo canceler so that the call assistant can transcribe the conversation. So for them to come back now and say it didn't mean the echo canceler— and if you look at the inventor's own testimony, and this is at 15705, that's where he says, look, echo cancellation was a component of the CapTel trials for which we were seeking reimbursement. And that's at 15705. That's their own inventor. So one, as a factual matter, it just doesn't work. They were asking the FCC to reimburse them for a working service. The fact that they now say their system worked without echo cancellation, well, you wouldn't get reimbursement if that was the case, because if the echo canceler didn't work, then the service doesn't work as they've represented it to the FCC. But again, that's irrelevant, because the relevant time period is February 2004. They have never contested that echo cancellation did not work, nor could they, since that was after the CapTel trials. The clock is running, so let me just have you spend a little time talking about the secondary considerations and the discussion we had with your friend about exactly what the district court judge was saying or doing here. Sure. So I think what the district court was doing is what— this is the court's rule, for example, in Richardson-Vicks, where it says, look, and I think the district court said, look, there's some evidence here of secondary considerations, but ultimately it's a legal balancing inquiry. I have to look at the evidence under all the gram factors. I have to weigh the evidence of obviousness under the first three. But he says, when he says that he uses the term, we're very weakly tied. Do you agree he must have been saying there wasn't really a nexus shown? I think he's talking about nexus there. And isn't there kind of in our law a presumption of nexus? And wasn't there sufficient basis for the jury to conclude there was nexus on this record? Well, Your Honor, I don't think here that you would get the presumption of nexus. And that's because the CapTel service to which they were tying the praise, the licensing, and sales and all of that thing, that was not coextensive with the claim to invention. The CapTel service also encompassed one-line service. That is, it wasn't limited to the two-line invention in the 398. It wasn't coextensive. It also, CapTel service, as it exists, encompasses both two-line and one-line, which was the prior invention. I thought they separated out the number of calls that were processed in the two-line system. They didn't separate out the number of calls, the minutes of usage. The only thing they say, and this is only with respect to the commercial success factor, is they said they sold more two-line phones than one-line phones. But two-line phones can also do one-line service. There's no evidence. They didn't present any evidence. But wouldn't the judge have had to say that your evidence was sufficient to overcome the presumption of nexus, and that's not what the judge said? Well, Your Honor, I guess – The judge just said there's a nexus, there's a presumption of nexus, but it's not great. No, Your Honor, the judge never found a presumption of nexus. Well, then that would have been a mistake right there. Well, no, no, I don't think so for the reason that I just gave, that CapTel service is not coextensive with the claimed invention. CapTel service includes both two-line, and this is undisputed, and one-line service. One-line service is not part of the patent 398. That was a prior thing. So CapTel service, when they're talking about the praise, the licensing sales, all of that stuff, that encompasses one-line. So the presumption of nexus applies when it's coextensive. Then you get the presumption that, okay, well, all of your evidence of secondary considerations were here. So you don't get it. But even if you did have some sort of nexus, I think the district court was within its bounds in saying, look, it's relatively weak here, but ultimately, as this court said in Richards and Vicks, and Richards and Vicks is actually a tougher case there, just like in this case the jury found obviousness there, just like in this case the judge ruled for JNOV, judgment notwithstanding the verdict on obviousness. But unlike here, the judge made an error and said, I think secondary considerations are irrelevant. He had some basis to say that I'm disregarding the secondary considerations of evidence in that case. What this court said is, look, the district court was wrong on disregarding the secondary considerations of evidence. There was substantial evidence supporting secondary considerations, but ultimately, it is a legal balancing under the Graham factors. We have to look at that. The court has to decide. And we, the federal circuit, are going to say, look, even though the district court gave short shrift to that, we think ultimately he got it right because of the overwhelming evidence. Is there anything in the opinion where he articulates the weakness argument that you make here, that it had the one line and the two line, for example, taking the commercial success? Does he articulate his agreement with that, that that was the basis? The secondary considerations portion of the opinion doesn't directly address that. He does say in a number of places that you couldn't connect it to the claimed features, the praise or the licensing or the commercial success. And to me, that's where you can draw the fact that this invention wasn't, in fact, coincidental with the 398. And so that's, to me, the closest you get it. You also have, but ultimately, I guess what I would come down to is the district court did credit some evidence of substantial, did credit some evidence of secondary considerations, but then did what this court says a court is supposed to do. Ultimately, it's still a legal question as to whether under the Graham factors, evidence of obviousness under the Graham factors outweigh the evidence of non-obviousness under the secondary considerations. And what the district court said is that, yes, as a matter of law here, given all the evidence of obviousness here, that it would outweigh. And so that, I think, that mode of analysis is correct as a matter of law and it goes exactly to the bifurcation between the jury's role and the judge's role that this court has set out. Thank you. Thank you, Your Honor. Your Honors, a few clarifying points. Can I just ask you a couple of questions? Of course, Your Honor. So I'm clear about it. If we look at February 2004, is there evidence in the record that there was concern that the echo cancellation wouldn't work in the one-line system? If we look exclusively to the one-line system, I believe the last record evidence takes us out at least through August 2003. And then there was, you know, from that, it is such a small timeframe, the jury certainly could take a reasonable inference that everything wasn't perfect. But, you know, we're looking at this timeframe and deciding whether another POSA would have been motivated to combine. And if you look at all of Ultratech's evidence, there is a lot of evidence that would dissuade a POSA because of the two years of problems that CapTel had during the trials. Okay. The other question I have is, was there any evidence that someone would anticipate difficulty in moving the echo canceller from the relay to the caption foam? I know you argue that the testimony that we were talking about earlier wasn't a concession, that it would have been logical to do it. But is there, did you have any testimony that it would have been difficult to move the echo canceller from the relay to the caption foam? Yes, Your Honor. And I would circle back to the sites I provided at the beginning of argument. Mr. Caldwell said he wouldn't, the thought was you wouldn't be able to control the echo canceller. You couldn't strengthen or decline, for example, the strength of the telephone signal if the echo canceller was failing. If it's in every single phone, thousands of phones across the country, he lacks control as opposed to one box at his relay station that he can modify as there are problems. The other thing he testified to were the varying conditions of the literally thousands of telecom companies across the country. He doesn't lack, he doesn't have control over that. And so he said that was a reason why they didn't even think to try to use the echo cancellation at the beginning. And in fact, they didn't put echo cancellation. That doesn't really address, what I'm asking is did your witness specifically address a difficulty in moving the echo canceller from the relay to the caption foam? Do you mean as a question of fact when Ultratech did it? Is that someone would have been deterred from making this combination because of the difficulty in moving the echo canceller from the relay to the caption foam? You pointed out to us testimony, you said that doesn't stand for the opposite proposition, but where is the testimony that says that someone would have been deterred because of the difficulty in moving from the relay to the caption foam? I would have to refer your honor once again to the testimony of Mr. Caldwell that I've already cited, that not only would someone be deterred, but he was deterred. No, but that doesn't address the movement from the relay to the caption foam. I'm asking not in a general matter whether someone would have been deterred, but whether one would have been deterred from the necessity of making this one movement. Yes, your honor. Because once you move it from the relay to the phones, the caption telephone service provider would lack control. So when there are problems with it, when the echo canceller fails, for example, what do you do about it? He lacks control. He can't go to 10,000 telephones across the country. He also testified at length that I can't begin to do justice to, but the same site I referred to you that the varied conditions of telephone lines provided by thousands of various telecom companies, he explained why that would deter someone from thinking that you would want to move the echo canceller to the phones. You know, the various testimony on the incompatible architecture, signal flow, and that Mr. Ludwig summarized as well, based on that testimony, he came to that conclusion as an expert. Speaking of the experts, just to clarify a couple of points that counsel made, as far as Ultratech's four experts all agreeing that this was a modest place or it was the reasonable place to go. First of all, obviously, their expert was impeached and the jury had the right to disregard. But as far as the four experts of Ultratech, that is Mr. Ludwig, and we read that testimony. He didn't make that admission. The other three are the inventors. And under Standard Oil, for example, cited in our brief, you don't look to the aha moment what the inventors, persons of extraordinary skill, actually thought. Wait a second. It's not automatically true that an inventor is someone of extraordinary skill. We have plenty of cases where we've relied on inventor testimony as being POSA testimony. Okay. Two responses to that, Your Honor. You're correct. First of all, just so we're clear, none of the inventors said a person of ordinary skill in the art would have done this or found it obvious or reasonable. They never said that. As far as the skill of these three inventors, they invented the entire caption, telephone, put a period there. They invented all the software, the hardware, all the methods. Was their background different from someone who was a POSA? You mean their educational background, Your Honor? There was a stipulation about what a POSA was. Do they not fit within that category? No, Your Honor. They do not. Because of the background? Because of their achievements and expertise and experience, which you would rely upon. Would you be a POSA if you had a certain level of achievements? Okay. One should not go about determining obviousness under Section 103 by inquiring what patentees, i.e., inventors, would have known. That is Standard Oil v. American Sciamid 774F2nd 448 from this court. Do you have a final point? Yes, Your Honor. As far as the nexus and secondary considerations, I believe counsel misspoke. In fact, the evidence, as is referred to in our brief, does separate the one-line minutes from the two-line minutes. And there was never a challenge to commercial embodiment at trial. So this question of nexus is a red herring. Finally, as far as the FCC, there was unrebutted testimony as to what that testing was in that petition. And if the court has any concerns as far as what the FCC would have known or, frankly, what Sorenson knows about recording telephone calls, if you look to the evidence that we cited in support of PRAISE, for example, there are multiple documents from Sorenson where they repeatedly script for their call assistants. FCC rules prohibit any recording of calls, and we are audited regularly by the FCC. The FCC rules prohibit any recordings of your calls, so your calls are never recorded. That's a really undisputed fact. So there is no way that the FCC would have known that Ultratech was recording calls, which is how you would have tested with echo cancellation. Okay, thank you. Thank you, Your Honor. We thank both sides, and the case is submitted. Next case for argument is 171828.